FILED
1/16/20 5:29 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

ROWENA V. WAGNER,                     :      Case No. 17-11252-TPA
    *Debtor*                              :
                                         :      Chapter 13
  ROWENA V. WAGNER,                   :
    *Movant*                             :      Related to Doc. No. 141, 172, 188
                                         :
    v.                                   :
                                         :
  MICHAEL ANTKOWIAK,                  :
  BERNARD WAGNER, *et al.*,           :
    *Respondents*                        :


*Appearances:*        Kenneth M. Steinberg, Esq. for the Movant
                 John Nagurney, Esq., for Respondent Bernard Wagner[1]


## **MEMORANDUM OPINION**


      Presently before the Court for determination, is the allocation of the marital property

as between the Debtor, Rowena Wagner ("Wife"), and her husband Bernard Wagner ("Husband"),

who is also a bankruptcy debtor in his own separate case filed at Case No. 10-19934-TPA. This

Opinion will also address any remaining issues still pending in the adversary proceeding of *Wagner*

*v. Wagner*, Adv. No. 19-1001-TPA as the two matters are inextricably intertwined and were tried

together. Now that trial has concluded, all post trial filings are complete, the Parties have been

---

[1]

      Bernard Wagner was represented by Attorney Gary Skiba at the trial but he subsequently
withdrew his appearance. Following a brief time during which Bernard Wagner was acting *pro se*,
Attorney John Nagurney entered an appearance on his behalf.

granted a divorce, and the major asset held by the Parties has recently been liquidated, this matter is ripe for decision.

## JURISDICTION

The Court finds that it has "related to" jurisdiction over this matter because the determination of the allocation of marital property will have a direct impact on the extent of the property of the estate in both Wife's and Husband's cases. *See, 28 U.S.C. §1334(a)*, *In re Topfer*, 587 B.R. 622, 628 (Bankr. M.D. Pa. 2018) (bankruptcy court had related to jurisdiction over equitable distribution matter because it could affect debtor's case by determining the extent of his property interests, citing *In re Resorts International, Inc*., 372 F.3d 154 (3rd cir. 2004)).

As to whether the marital property allocation process constitutes a "core" proceeding, the answer to that is less clear. This matter does not appear to be a "core" proceeding under any of the various subsections of *28 U.S.C. §157(b)(2)*, which constitute a non-exclusive list of core proceedings. Such a finding would be consistent with the finding of the court in *Topfer, supra*. On the other hand, Husband has affirmatively asserted that he believes this is a core matter under both *28 U.S.C. §157(b)(2)(A)* (matters concerning administration of the estate) and *28 U.S.C. §157(b)(2)(O)* (other proceedings affecting the liquidation of the estate), and Wife agrees. *See*, Doc. Nos. 190, 195, and Adv. Doc. Nos. 1, 15. While not conclusive, both Parties also agree that the Court has jurisdiction in this matter, *Id*. In any event, even if the matter is deemed non-core, the Parties appear to have nonetheless consented to the entry of a final judgment by this Court as authorized by *11 U.S.C. §157(c)(2)*. *Id*. The Court therefore finds that it has the jurisdiction to enter

a final judgment in this matter.[2]

## BACKGROUND

The Parties were married on July 14, 1994, in Virginia.[3]  They lived together thereafter until September 9, 2016, when Wife left the marital residence located in Cochranton, Pa. Husband initiated a divorce action in the Court of Common Pleas of Crawford County on March

---

[2]

Both Parties consented to the entry of final judgment by this Court in *Wagner v. Wagner*, Adv. No. 19-1001-TPA (Complaint and Answer at ¶5, Doc. Nos. 1, 9).  In addition, Husband consented in his *Motion to Dismiss* filed in his bankruptcy case on December 4, 2019 at Doc. No. 176 (see prayer for relief) and in the colloquy between the Court and Husband's attorney that took place at the hearing on the *Motion to Dismiss* (*See Audio Transcript of Proceedings* dated Jan. 8, 2020 at 11:24:22 through 11:24:46).  If it is ultimately determined that this is a non-core matter, and that the Parties did not effectively  consent to this Court entering a final judgment, then the Court intends this Opinion to be proposed findings of fact and conclusions of law for the consideration of the District Court pursuant to *11 U.S.C. §157(c)(1)*.

[3]

Husband questioned the validity of the 1994 date for the inception of the marriage  because in 1997 the Parties traveled to Wife's home country of the Philippines for a visit, during which time Husband contends the 1994 marriage was "annulled" and the Parties were remarried in a ceremony in that country.  Wife acknowledges this 1997 trip and the marriage ceremony which occurred, but stated that it was done solely for the benefit of her family and denied knowledge of any annulment of the 1994 marriage.  Husband argued that this sequence of events invalidated the 1994 marriage and calls into question the ability of a court in this country to order an allocation of the marital property.  The Court rejects that argument.  No documentary evidence or law was provided to support either the existence or the effect of the purported annulment and subsequent remarriage. Further, the Court  notes that it is likely that Husband is judicially estopped from even making such argument since prior to the filing of Wife's bankruptcy case he initiated a divorce action in state court including a claim for equitable distribution, as is noted subsequently above.  Finally, even if the Virginia marriage in state court in 1994 was somehow rendered a nullity by events occurring in the Philippines 3 years later, it is undisputed that the Parties were "remarried" at that time and that both Parties have been residents of Pennsylvania for many years since then, making Pennsylvania law the appropriate vehicle for adjudication of  a divorce and allocation  of marital property.  *See, Sinha v. Sinha*, 334 A.2d 600 (Pa. Super. 2003) (Pennsylvania court properly exercised jurisdiction in case where India was the place of marriage, but where parties were both domiciled and employed in Pennsylvania).

9, 2017, which included a claim for equitable distribution. *See, Wagner v. Wagner*, No. 2017-92-V ("Husband's Divorce Action"). Wife filed her bankruptcy case on November 28, 2017, to forestall a sheriff sale that had been scheduled on the marital residence, a farm property of approximately 100 acres located in Cochranton, Pa. (for convenience, the Court will hereinafter refer to this property as "the Farm").

On May 21, 2018, Husband filed a motion for relief from stay in Wife's bankruptcy case, seeking relief so that he could proceed with Husband's Divorce Action, including equitable distribution. When the matter came to the attention of the Court it initially granted conditional relief from stay, but when over the course of several months it became apparent that Husband's Divorce Action was moving at "glacial speed," and that resolution of the issue of the allocation of marital property between the Parties was necessary for Wife's bankruptcy case to be concluded, the Court set a firm deadline for Husband's Divorce Action to be substantially resolved, or the equitable distribution issue would be referred to mediation in the Bankruptcy Court. If the mediation process failed, the Court made clear to the Parties, it would make the necessary allocation of marital property.

The above-referenced deadline passed with no progress in Husband's Divorce Action, and a subsequent attempt at mediation having failed. In the meantime, Husband filed his own bankruptcy case on January 16, 2019. Eventually, in April of 2019, a trial on the marital property allocation matter was scheduled by the Court for April 24, 2019. A few days before the scheduled trial, Husband attempted to have Husband's Divorce Action dismissed in an obvious effort to thwart this Court's ability to make a marital property allocation, apparently based on the premise that the

4

Court would be unable to do so if there was no divorce action pending in state court.  Wife quickly countered by filing her own divorce action in state court on April 15, 2019.  *See, Wagner v. Wagner*, No. FD 2019-1385 ("Wife's Divorce Action").  Husband was  served with a copy of the complaint in that case on April 16, 2019.

Both Husband's Divorce Action and Wife's Divorce Action are open and pending. The Court was recently informed by way of a *Status Report* filed by Wife's attorney at Doc. No. 301 that both divorce cases pending in Crawford County, PA, were assigned to Senior Judge H. William White.  On December 2, 2019, Judge White consolidated those cases, bifurcated them as between the divorce claims and the claims for equitable distribution, and entered a decree of divorce dissolving the marital relationship.[4]   A copy of the December 19, 2019 Findings of Fact and Order/Decree entered by Judge White were filed on the docket in this case on December 27, 2019 at Doc. No. 308, and they do indeed confirm the accuracy of what was stated in the *Status Report* filed at Doc. No. 301.

At the time of trial in this Court, it was learned that Wife holds a Masters Degree earned during the marriage and has been employed for about seven years as a teacher by the Crawford Central School District.  She earns a gross salary of approximately $4,500 per month and

---

[4]

As discussed in more detail *infra*, the Court has the power to allocate the marital property of the Parties independent of Pennsylvania law on divorce and equitable distribution, although it will look to such law for guidance on how to make the allocation.  One potential issue arising under Pennsylvania law is that an equitable distribution may not be made by a court *before* a decree of divorce is granted, but only contemporaneously with or subsequently thereto.  *See, i.e., In Re Estate of Bullotta*, 838 A.2d 594, 596 (2003).  Until recently there had been no decree of divorce between the Parties which, while not impeding this Court's ability to act, could have at least clouded matters. In any event, the recent entry of a decree of divorce by Judge White renders that issue moot.

a net, after payroll deductions, of approximately $3,200.[5] She has as dependents two teenaged sons, children of the marriage who have apparently been residing with her since the separation. In addition to her income from employment, Wife testified that she receives $600 per month for each of these dependent children from Social Security. No evidence was presented as to any child support from Husband. Wife has a pension through her employment, and as of the September 9, 2016 date of separation, it was valued at $84,238.93.

Husband is 75 years old, significantly older than Wife. He has been residing alone at the Farm since the date of separation. He receives Social Security income of $1,194 each month and also receives some income from a dog breeding business which has been ongoing for an extensive period of time, extending back before the date of separation. Husband had also been receiving rental income from some acreage of the Farm that he leased out beginning in 2017 and continuing through this year, as well as some gas royalties. The Farm was recently sold as part of the bankruptcy cases and no further such rent or royalties will be forthcoming. Husband continues to reside at the Farm following the sale, the buyer having agreed to carve out the actual residence itself and some surrounding acreage to lease back to Husband for 20 years on what obviously involves extremely favorable terms.

---

[5]

Pursuant to *F.R.E. 201*, the Court takes judicial notice of the petitions and schedules filed by Wife and Husband in their respective bankruptcy cases and uses each as the source of evidence for a number of findings in this paragraph, as well as subsequently herein. *See, e.g., In re Cyrilla*, Case No. 18-20017-GLT, *Memorandum Opinion* of January 7, 2020, Doc. No. 234, citing *U.S. Trustee v. Stone Fox Capital, LLC* (In Re Stone Fox Capital LLC) 572 B.R. 582 (Bankr.W.D. PA 2017). It would have been much preferable to have had sufficient evidence presented at trial as to this sort of information so that reliance on judicial notice of these documents was not necessary, but disappointingly, at trial neither side presented the full scope of information required for the Court's determination in this regard.

Additional details concerning the Parties will be discussed as necessary in the remainder of this Opinion.

### *LEGAL DISCUSSION*

Since what the Court will be doing here is tantamount to the equitable distribution process under the law of divorce, the Court will look to the applicable law of Pennsylvania in that regard for guidance in fashioning a fair allocation of the marital property of the Parties.

In an action for divorce or annulment, the Court must first determine what is marital property, and then apply the relevant factors for equitable distribution. *Smith v. Smith* 749A.2d 921 (Pa Super 2000). "Marital property" is defined generally in *23 Pa.C.S.A. §3501(a)* as all property acquired by either party during the marriage, and the increase in value during the marriage of certain non-marital property, with a number of exceptions. All real and personal property acquired by either party during the marriage is presumed to be marital property, regardless whether the title is held individually or by the parties in some form of co-ownership. *23 Pa.C.S.A. §3501(b)*.

Once the universe of marital property has been determined, the Court's task under Pennsylvania law is to "equitably divide, distribute or assign, in-kind or otherwise, the marital property between the parties without regard to marital misconduct in such percentages and in such manner as the court deems just after considering all relevant factors." *23 Pa. C.S.A. §3502(a)*. The statute goes on to give a non-exclusive, non-exhaustive list of factors that may be considered. Before turning to a discussion of the marital property involved in this case and an allocation thereof, the Court will make a detour to discuss an important point as to how it viewed the evidence that was presented.

7

The two key witnesses at the trial of this matter were the Parties themselves.  Their testimony agreed on many relevant points, but where they disagreed, and where there is no other documentary or testimonial evidence of record to help the Court determine what actually occurred, the Court is necessarily faced with making an assessment of the credibility of the Parties.  In that regard, the Court will state bluntly that it found Wife to be generally a more credible witness than Husband.  That conclusion is based  not only on the trial testimony itself, but from the Court's observations of the Parties occurring throughout this particular proceeding, as well as in other matters involving the Parties in their ongoing bankruptcies.  *See, e.g., Liteky v. U.S.*, 510 U.S. 540, 551 (1994) (judge's knowledge and the opinion it produced are properly and necessarily acquired in the course of proceedings, and are sometimes, as in a bench trial, necessary to the completion of the judge's task).

Of particular note in this respect is the striking difference in the demeanor of the Parties in matters that have come before the Court for resolution.  Wife has for the most part been forthright and cooperative, whereas Husband has largely been evasive, obstructive, and anxious to cause delay.  While some of this can no doubt be attributed in part to the personalities of the two individuals, the Court cannot help but conclude that much can also best be explained by Husband acting like someone with something to hide, someone with an obstructive attitude or like someone who does not believe the rules apply to him.  Moreover, based on the actions and conduct of Husband, before this Court and as documented in the state court proceedings, his credibility regarding material events to which he testified in the matter currently at issue, must be viewed through the prism of the obvious animosity and bitterness he holds toward Wife and their marital

8

separation.  While it appears Wife took a somewhat restrained approach toward the proceedings

taking place in state court, and in large part to the current matter, Husband's posture throughout has

been extremely contentious, filled with acrimony and erecting roadblocks wherever possible to

thwart Wife's attempts at obtaining a fair, reasonable and expeditious distribution of marital assets.[6]

In short, Husband's conduct as observed by the Court throughout this and the related proceedings

reflects poorly on his credibility as a witness.

It will not be necessary here to exhaustively catalog all of the instances of conduct

by Husband that have caused the Court to reach its opinion, but a sampling may be helpful.  One

incident involved a 2014 Cadillac Escalade motor vehicle owned jointly by the Parties, and on which

Galaxy Federal Credit Union ("Galaxy") held a lien.  Shortly after Wife's case was filed Galaxy

moved for relief from stay in an effort to obtain authorization to repossess the vehicle.  Wife, who

had been the principal driver of the vehicle, did not oppose the requested relief, but Husband did.

At a hearing held in March 2018 the Court suggested to Husband's attorney that he

should make the vehicle available to Galaxy so they could inspect and value it, given that the vehicle

was a wasting asset.  At a subsequent continued hearing held in May 2018 the Court was

disheartened to learn from Galaxy's attorney that the people who had been hired to retrieve the

vehicle reported that Husband informed them that he had disabled and hidden the vehicle.  As a

---

[6]

These tactics included the filing of frivolous pleadings, creating excessive delays resulting
in the waste of an inordinate amount of this Court's time as well as that of the state court, causing
Wife's attorney fees and litigation costs to dramatically increase, failing to fully disclose assets,
raising unsupported allegations of material changes in circumstances, hiring and firing of attorneys
and proceeding pro se at critical junctures in the proceedings.  In the Court's view these actions were
designed to frustrate and obstruct the judicial process wherever possible so as to make the resolution
of the Wife's legitimate property claim even more difficult.

result, and at the suggestion of the Court, Galaxy subsequently filed a turnover motion that repeated the same allegations that Husband had hidden and disabled the vehicle. *See*, Doc. No. 89 at ¶13. The matter was finally resolved by a consent order signed on July 3, 2018, more than 5 months after Galaxy filed its first motion, and months after Wife had agreed to the relief being requested. Largely due to Husband's intransigence, the cost required to resolve the Galaxy claim (which just recently occurred) continued to unnecessarily increase over time.[7]

Another notable example of Husband's disruptive behavior involved attempts to sell the Farm, which everyone understood to be the major asset of both Parties, and in which all interested Parties recognized would need to be sold in light of the Parties' marital breakup. Wife began that process on April 22, 2018, by filing a motion to employ an appraiser to conduct an appraisal of the Farm. That request was granted on May 2, 2018, but at a hearing held on May 30, 2018, Wife's attorney informed the Court that the appraiser had not yet been able to obtain Husband's consent to access the Farm for purposes of the appraisal.

At a July 25, 2018 hearing, Husband's attorney informed the Court that Husband would like to continue living in the house after a sale by subdividing that portion of the property from the rest of the Farm. The attorney informed the Court that she had advised Husband several times that he would need to initiate a subdivision process if that is what he wanted to do. At a continued hearing held on August 16, 2018, it was reiterated that Husband would like to subdivide

---

[7]

*See, Wagner v. Galaxy Federal Credit Union*, Adv. No. 19-1039-TPA, filed in Husband's bankruptcy case, and particularly Doc. No. 13 (Consent Order of January 15, 2020), establishing the Galaxy claim at $47,533.58 which the Chapter 12 Trustee has been directed to immediately remit to Galaxy.

the Farm, but nothing was presented to show that he had actually taken any steps to attempt to do

so.  The Court at that point gave the Parties a deadline to reach a settlement or the matter would be

referred to mediation.

On October 17, 2018, Wife  filed a Status Report which reported that an offer had

been made on one piece of the Farm which was thought to be reasonable, but went on to note:

> But the offer has been withdrawn by the buyer. The reason given to counsel from the potential buyer's realtor is that the potential buyer feels it is unsafe to send a surveyor to the land to do the survey for the subdivision. The potential buyer apparently ran into Mr. Wagner, the estranged husband, and Mr. Wagner made it clear that there will be no surveyor permitted on the land and that the property will not be sold.
>
> In addition, the realtor for the potential buyer believes that it is unsafe for anyone to be dealing with the property and also has concerns for the safety of debtor's realtor. I have confirmed this with debtor's Court-appointed realtor who is afraid of placing a "For Sale" sign on the property for the same reasons. I will not detail the specific reasons as to why they have the concerns in this public document, but will be able to express the reasons given to me for their concerns in camera or if ordered in a Court hearing.

*See*, Doc. No. 129.  Then, on November 15, 2018, Wife filed a motion seeking to have a status

conference scheduled to discuss the difficulties with selling the Farm, including the fears of the

realtors "which has paralyzed efforts to sell the property."  *See*, Doc. No. 132.  That motion was

denied as moot because the Court issued an Order to Show Cause ("OTSC") against Husband on

November 20, 2018, following a phone conference with all counsel on November 19th, noting that

it was very disappointed with Husband's allegedly obstructive behavior related to attempts to sell

the Farm.  That OTSC was eventually vacated, but an Order was issued on December 13, 2018,

directing the Farm to be immediately listed and directing Husband to cooperate in its sale, Doc. No.
139.   There was thus a nearly 8-month delay in getting the Farm sale process started and
implemented in earnest, for which the blame lies primarily with Husband.  Of course, as with his
alleged conduct related to the Cadillac Escalade, Husband vociferously denied he did anything to
hamper the realtor's ability to sell the Farm or the surveyor's ability to complete a survey.

Another example of Husband's disruptive conduct relates to efforts to mediate the
Parties' dispute.  The Court issued an Order on January 8, 2019, referring the matter to mediation
and naming a well-respected local attorney  as mediator.  A subsequent conflict check by the
attorney revealed that another member of the prospective mediator's firm had briefly represented
Husband in an unrelated matter.  The Court did not believe this would rise to the level of an actual
or impermissible conflict, and was prepared to allow the mediation to proceed under the direction
of the designated attorney however Husband objected (though, ironically, not Wife, who one may
have assumed would be the party with the stronger basis to object), and as a result a different
mediator had to be located, delaying the process by several weeks.

In addition to the above, other incidents of apparent attempts to frustrate court
process could be mentioned including Husband's attempt to withdraw his pending state court
divorce action on the eve of trial in an effort to derail the property distribution evidentiary hearing
(discussed previously in this Opinion), and his penchant for refusing to cooperate with his own
attorneys and not taking their advice, resulting in multiple instances of attorneys seeking, and
obtaining, leave to withdraw from representing him (*see, e.g.*, Doc. No. 217).

The Court cannot simply ignore all of Husband's behavior in this regard. It definitely has had a negative impact on the Court's perception of Husband's overall credibility when it comes to disputed issues of fact.[8] That having been said, the Court can now return to the main thread of its analysis.

### (A)  Marital Property of the Parties

There are six categories of assets that make up the marital property of the Parties in this matter:

(1)    The Farm (as indicated already, an approximate 100 acre parcel including farming acreage and a residence located at 179 North Franklin Street, Cochranton, Pa.);
(2)    Personal property unrelated to farming operations, such as furnishings and appliances;
(3)    Jewelry;
(4)    Equipment and animals that had been used in farming operations;
(5)    Farm-related income from rent and royalties generated since the date of separation; and,
(6)    Wife's pension.

With the exception of the Wife's pension, there are disputes of various sorts related to each of these categories of assets that need resolved. As for the Wife's pension, there was no dispute that it is marital property, and that its value for purposes of an allocation is $84,238.

---

[8]    It should also be noted that this Court is not the only one to have found Husband's conduct troubling. In his recently issued "Findings of Fact" in the Parties' state court divorce actions, Judge White found that Husband was "abusing the process and abusing the system," and that "his conduct is vexatious."

The first dispute to be resolved affects the assets identified in categories (1), (4), and (5) in the above list, *i.e.*, the Farm itself, farm equipment and animals, and income related to the Farm. These three categories need to be considered together because they all relate to the farming operation that was conducted on the Farm following its purchase by Husband and Wife on March 9, 2006 as tenants by the entireties.

Husband testified that the Parties had entered an agreement prior to either of the bankruptcy filings pursuant to which the Farm was being operated as a partnership, with Husband a 90% partner and Wife a 10% partner. Based on this purported agreement, Husband contends that the allocation of all marital property related to the farming operation should be made based on this 90/10 split. Husband did not produce any written partnership agreement to that effect, but did point to filed tax returns that reflected such a partnership arrangement. Husband's Exhibit 3 is a 2006 federal tax form 1065, "U.S. Return of Partnership Income," for an entity identified as "Wagner Acres," with a principal business activity of "farming" and an address shown as 179 North Franklin St., Cochranton, PA, the address of the Farm. That return indicates that the business started on March 10, 2006, the day after the Farm was purchased by the Parties. An attached Schedule K-1 does indeed show Husband as a 90% partner and Wife as a 10% partner.

Wife denied knowing anything about the purported partnership arrangement and testified that she did not carefully review tax documents for herself before signing them, relying instead on Husband and the person who was hired to prepare the forms. The tax preparer, Linda Dailey, testified at trial that she did prepare partnership returns for the Farm for the years 2006 through 2016 and all were with the same arrangement as shown in the 2006 form. When the Parties

14

separated she told them she could no longer prepare the tax returns. She thought that Wife was aware of the partnership arrangement, but she acknowledged that she never saw a partnership agreement supporting the arrangement. She also acknowledged that the 2006 return admitted as Exhibit 3 (the only one admitted as an Exhibit at trial) was not signed by the Parties, which indicated to her that she would have prepared the form and then given such unsigned return to the Parties for them to sign later and file on their own.

Husband strenuously argued the existence of the alleged partnership agreement, but he has not explained why the existence of such a partnership agreement would result in the exclusion of the Farm and the related assets from being considered marital property for purposes of an equitable allocation, or why it would dictate the terms of a property allocation. It is, after all, well recognized that the partnership interest of a spouse acquired during the marriage is marital property. *See, e.g., Perlberger v. Perlberger*, 626 A.2d 1186, (Pa. Super 1993), appeal denied 637 A.2d 289 ( Pa. 1993), *Buckl v. Buckl*, 542 A.2d 65, 67 (Pa. Super. 1988) (husband's partnership interest was marital property).  *See also, Mackalica v. Mackalica,* 716 A.2d 653 (Pa. Super 1998) (generally, all real and personal property acquired by either party during marriage is presumed to be marital property regardless of the name in which title is held or the form of ownership).  Thus, even if the Court finds that there was a partnership agreement as Husband contends, it is not apparent why that would change the character of the assets from marital property, or require that those assets should be distributed in contravention of the equitable allocation prescribed by Pennsylvania law.

While Husband has not advanced a legal argument as to why the alleged partnership should affect the character of the assets in question, the Court itself has considered whether any of

the exceptions to the broad marital property definition set forth in *23 Pa. C.S.A. §3501(a)* might apply here.[9]   One seemingly potential candidate is the following exception listed in *Section 3501(a)*that provides marital property does not include "(2)  Property excluded by valid agreement of the parties entered into before, during or after the marriage."  *23 Pa. C.S.A. §3501(a)(2)*.

Perhaps it could be argued that the alleged partnership agreement was a "valid agreement" that the Parties made during their marriage that falls within the scope of this exception. The problem with that argument, however, is that Husband only contended that the partnership agreement related to an allocation of profits from the farming operation during the Parties' marriage. He did not claim that part of the agreement was also to exclude the property used in the farming property from being considered marital property in the event of a divorce, or that it established a distribution allocation of the property upon the Parties' divorce.  Therefore, even assuming the existence of a partnership agreement as alleged by Husband, that does not mean the assets related to the farming operation would be excluded from marital property under *Section 3501(a)(2),* or removed from an equitable allocation upon the termination of the marriage.[10]

---

[9]

In considering this question, the Court is mindful of the fact that the burden of proof by a preponderance of evidence rests with Husband to show that one of the exceptions applies. *Mackalica, supra*.  Husband failed to meet his burden in regard to any of the accepted exceptions.

[10]

The Court's sense is that the farming operation was characterized as a 90/10 partnership strictly for tax-related purposes, or perhaps to enhance Wife's ability to collect unemployment related to the part-time teaching position she held at the time as Husband suggested, and not out of any recognition that it was intended to reflect the actual economic relationship between the Parties regarding the Farm.  The Court notes that during the testimony of Husband, he at one point stated that Wife had commented that she was going to outlive him anyway so "the 90-10 didn't really mean too much."  This is not the type of thing Wife is likely to have said if she thought she was agreeing to forego her normal marital property rights in the Farm.

The only other exception identified in *Section 3501(a)* that could conceivably apply here appears to be the one providing that marital property does not include "(1) Property acquired prior to marriage or property acquired in exchange for property acquired prior to the marriage." *23 Pa.C.S.A. §3501(a)(1).*

Husband testified that the Farm was acquired after he was injured and had to stop working at his former oil field job.  He testified that the sources of funding for the purchase were a $45,000 disability payment he had received for the injury, money from his IRA, funds from the sale of the house where he and Wife were residing prior to the purchase of the Farm, and a purchase money mortgage loan.  None of these, however, can be considered "property acquired prior to the marriage" so as to trigger *Section 3501(a)(1).*  The only component of the Farm purchase funding that could possibly have been acquired by Husband prior to the marriage was the money from his IRA, but he offered no proof as to the source or timing of payments into the IRA.  The Court notes that the Parties had already been married for some 12 years at the time the Farm was purchased, plenty of time for accumulation of an IRA, so Husband has failed to overcome the presumption that the IRA was acquired during the marriage.  There was also a failure of any proof as to the source of funds for the purchase of animals and equipment used in the farming operation.  As such, the Court likewise concludes, that the *Section 3501(a)(1)* exception does not apply to them either.  To sum up, the Court finds that all of the assets in categories (1), (4), and (5) are marital property subject to allocation.  The value of these assets also needs to be determined.

The value of the Farm itself is best set by the sale thereof for $330,000 during this bankruptcy.  The Chapter 12 Trustee in Husband's case, who handled the sale, filed a *Report of Sale*,

Doc. No. 266, indicating that the net proceeds of this sale, which she is holding in escrow pending

further order of Court, are $307,907.55 subject to the liens of secured creditors – totaling $138,742

– which were transferred to the sale proceeds. After those secured creditors, anticipated capital

gains tax and Trustee fees are paid (approximately $13,385 based on 5% of applicable distributions),

the net liquidated value of the real property will be approximately $155,330.[11]  See attached

Appendix "A" to this Opinion.

The value of the animals and equipment used in the farming operation is more

difficult to determine. At the time of separation the animals consisted of two "show cows," nine or

ten heifers, and two horses.[12] Wife testified that she was told by Husband that one of the show cows

had been acquired by them for $5,000 and she believed the other to be worth $2,000 to $2,500. Wife

believes that Husband sold these two cows following the separation and retained all the proceeds

for himself, though she did not know how much he had received for them. She also believes he has

sold the heifers and retained those proceeds, though she does not know how much they were worth

or how much he received. Wife also testified that she believes Husband sold one of the horses, but

she does not know how much he received, and she gave no indication of the value of that horse, or

---

[11]

Wife argues that Husband's agreement with the buyer that allows him to lease and continue
to reside in the marital residence and a portion of the acreage for twenty years must have resulted
in a lower price for the Farm than could have been obtained otherwise, and the difference should be
counted as a benefit to Husband. The Court agrees that the post-sale lease to Husband is relevant,
but believes it is more properly factored into the equitable allocation discussion, *infra.*

[12]

As was indicated previously, Husband and Wife had engaged in a dog breeding business for
a number of years in which they bred and sold St. Bernard puppies. No evidence was provided as
to the value of any dogs used in this business so the Court has no basis for establishing a value for
them for marital property purposes and therefore does not include them in the marital estate to be
allocated.

the one horse she believes remains.  Husband admitted selling the animals, but he claimed not to know how much he had received for them.  He denied that the one show cow cost $5,000, but he did not give an alternate figure, and he expressed no opinion as to the value of any of the other animals.  In his bankruptcy schedules Husband listed as part of his property under "farm animals" two beef cattle with a value of $1,000.

As can be seen, the evidence as to valuation of the farm animals, and the amount of proceeds that Husband has received for their sale, is far from ideal.  The Court blames the failure of good evidence primarily on the Husband, who had exclusive possession of the animals following separation and apparently sold all or almost all of them, but who either could not or would not tell the Court how much he had received for them.[13]  Nor did Wife advance the inquiry in any way by offering any third party expert testimony as to the potential value of these animals.

Based on the record before it, the Court will credit Wife's testimony as to the value of the two show cows and heifers and assign a value to them of $5,000 for one and $2,500 for the other, for a total of $7,500.  As noted, no evidence was presented by either side as to the value of the heifers or the horses.  As such, the Court has no basis to assign any value as to them, though clearly Husband sold some of them and received some amount for them.  For purposes of the marital property valuation, the value of the farm animals is therefore set at $7,500.

---

[13]

When asked about proceeds he had received for sale of the animals, Husband claimed not to know and said it would be reflected in the "2017 taxes," but no such tax records were introduced into evidence at trial.

19

The evidence presented as to farm equipment centered around three items that Husband sold following the separation and a tractor that he still retains. Wife testified that she saw Husband sell the three items and that she never received any of the sale proceeds. Husband acknowledged that such a sale had taken place and he produced a receipt showing the price he had received was $1,200. He also testified to having sold an International tractor for $3,500 following the date of separation. As for the tractor still in his possession, a Mahindra model, Husband initially testified that he did not know how much it was worth, but later on cross examination he said it had a value of about $30,000. Approximately $10,000 is still owed on the tractor. As such, the Court finds the tractor has a marital property value of $20,000. The total value of farm equipment found to be marital property is therefore $24,700.

The last item for consideration in this group of assets is income Husband has received related to the Farm and farming operations since the date of separation. One form of income is rent received for a portion of the Farm for the years 2017, 2018 and 2019. This rental income was, respectively, $8,250, $9,075, and $9,982, for a total of $27,307.[14] The evidence established that Husband also received an average of approximately $125 per month in oil and gas royalties from the Farm from the date of separation, except for one such payment that was accidentally sent to Wife's post office box and cashed by her. Since the separation, 37 monthly royalty payments were made amounting to a total of $4,625, all of which has gone to Husband except for the one check to Wife. Offsetting that one check with one of the checks received by Husband, leads to a net amount

---

[14]

Direct evidence of the 2018 and 2019 rental amounts was provided at trial. There was no direct evidence of the 2017 amount, but in support of this finding the Court takes judicial notice of the 2017 lease which was attached as an exhibit to the *Motion to Sell Real Property Free and Clear of Liens Pursuant to 11 U.S.C. §363* filed by the Chapter 12 Trustee at Doc. No. 232.

of $4,375 in royalties that is deemed marital property.  Total rent and royalties related to the Farm thus are $31,682.

A third potential item of income related to the Farm is for "puppy sales."  Wife testified that between the time they bought the Farm in 2006 and when she departed in 2016  the Parties sold about 60 puppies per year, at a charge of between $700 to 800 per puppy.  Such sales would result in a gross income of approximately $45,000 per year related to puppy sales.  No evidence was provided as to support any expenses incurred in connection with the puppy sales. Wife did provide evidence to show that Husband continued to regularly advertise puppies for sale following the separation.  Furthermore, she suspects he has sold numerous puppies since the separation but admits she does not know how many or how much he may have received for them. Husband admitted he has sold "dogs" since the separation, but did not know how many he has sold, or how much he has received, aside from saying that the individual sale prices for the puppies were anywhere between $50 and $700.

The Court is reluctant to accept Husband's account of the value issue in light of the credibility issues previously mentioned.  However, Wife's inability to provide any credible testimony beyond the foregoing as to any monies received on the puppy sales requires the Court to find in favor of Husband regarding this aspect of property distribution between the Parties.

While Husband apparently earned income from puppy sales since the separation, based on the record before it the Court cannot find such income to be marital property for purposes of the allocation.  No evidence was presented to show such income was derived from operation of the Farm.  Unlike the rental and royalty income discussed above which were directly related to the

Farm itself, income from the puppy sales, whatever it may have been, again, based on the record before the Court, must be found to be predominantly attributable to the efforts of Husband rather than derived from marital property. Since no credible evidence was presented as to the value of any dogs being used for breeding – or even the timing of their acquisition – or the puppies themselves, no value can be included for purposes of finding such as marital property subject to distribution.

If some credible evidence addressing the circumstances of the dog breeding and sales as noted above, and of the value of the dogs that were allegedly marital property, was available to attribute to the "puppy sales," the Court would be in a position to at least consider classifying that income from such sales as being derived from the Farm and thus make it part of the marital property distribution. No credible evidence in this regard was presented. In the absence of such value any income so derived can only be attributable to Husband's efforts. Nothing in the record supports the value of the dogs/puppies pre-separation.

A final issue related to this group of assets is whether their value should be reduced to reflect expenses Husband has incurred in maintaining the Farm since the date of separation. The Court finds that they should not be so reduced for two main reasons. First, while Husband repeatedly contended at trial that he had put money back into the Farm to keep it going, he provided no evidence whatsoever to quantify or explain what those purported expenses may have been. The Court knows that he was not paying real estate taxes on the property because taxes that have been delinquent since the separation had to be paid out of the proceeds from the recent sale. Second, since the date of separation up to the date of its sale Husband has had exclusive use and possession of the Farm. Wife would be entitled to a credit of ½ the rental value of the Farm over that period

22

of time.  *See, Lee v. Lee*, 978 A.2d 380, 385-86 (Pa. Super. 2009).  In the absence of any evidence

as to either the expenses incurred by Husband, or the fair rental value of the premises, the Court

finds that any credit to which Husband may be entitled for expenses for upkeep of the property

during this period is offset by any credit due Wife because of his exclusive possession.  *See,*

*Sbarbaro-Mortelliti v. Mortelliti*, 2016 WL 4923509 (Pa. Super. July 6, 2016).[15]

The next group of assets to be considered is the non-farming personal property the

Parties owned (other than jewelry).  Wife left the marital residence with little more than a few bags

of her clothing and was subsequently unable to recover any additional such personal property on the

date set aside by the state court for her to return to the residence for that purpose because none of

the items she had been permitted to take could be located by her except for two iPads.  The Court

can only assume that the bulk of the Parties' personal property remains at the residence and in

Husband's possession.  No evidence was presented by either side at trial as to inventory or value

this personal property.  Wife testified at trial that she would be satisfied to be awarded the minimal

personal marital property currently in her possession, plus the refrigerator, stove, washer, dryer, side

table dresser from her mother, and the dishes from her mother, with Husband being awarded all

other personal property.  Husband did not oppose this request, when given an opportunity to do so.

Wife's request appears to be a very reasonable proposal to the Court under the circumstances.[16]  In

---

[15]

Wife sought to file a post trial brief at one point in the proceeding that apparently was, at least in part, designed to argue this point further.  *See* Motion at Doc No. 279 dated November 21, 2019; Order at Doc. No. 294 dated December 3, 2019.  Husband failed to file any Response.  At the January 8, 2020 hearing related to this Motion (in the form of an "Application") Wife's counsel withdrew his request to file the supplemental brief after being provided the opportunity to do so. *See Audio Transcript of Proceeding* dated Jan. 8, 2020, 11:37:04 to 17.

[16]

In addition to Wife's trial testimony in this regard, Wife reiterated her proposal in Paragraph 5 of her Post Trial Memorandum (*See* Debtor Rowena Wagner's *Post Trial Memorandum* Doc. No.

the judgment order entered in this mater the Court will therefore reflect this in-kind allocation of personal property, with no attempt to establish a value of the personal property that each Party will be receiving as a result of the same.

The last category of marital assets to consider is jewelry – a subject on which there was a wide divergence in the testimony of the Parties.  Husband testified that prior to and during the marriage he had purchased numerous expensive items of jewelry for Wife.  He produced appraisals done in 2007 for four such items – 2 rings, a pendant, and a necklace – and testified without objection that in addition to those items he had purchased numerous other jewelry items for Wife, such as bracelets, earrings and watches, for a collective amount of about $50,000.  The 2007 appraisals, Exhibits 18-21, which Husband said he had obtained for purposes of insurance, showed a total value of $19,500 for the four specific items.   Husband testified that he had not seen the various items of jewelry for some time before Wife left and he has no personal knowledge of where they are now.  The tenor of his testimony suggested that he believes Wife took the jewelry with her when she left.

Wife testified that the four specific items that were the subject of the 2007 appraisals were purchased for her by Husband, but she denied having any knowledge about any other expensive jewelry items having been purchased for her by him, testifying that the only other jewelry she ever had was of the "costume jewelry" variety.  She acknowledged having had the two rings

---

206 filed on May 9, 2019.  Husband never responded to this proposal either at trial or otherwise objected to it once it was set forth on the record.  Based on this admission/proposal and the contextual *de minimis* value of the same, as a practical matter, such a finding would actually appear to be a windfall for Husband.

when she left the marital residence, but denied having possession of the pendant, necklace, or any other item of expensive jewelry, or knowing where they are.  When asked why she had not taken those two items with her when she left Wife answered that she only wore them rarely and only took the rings because she wore them daily.  Wife said she had not been aware of the 2007 appraisals until she learned of them in the divorce litigation.  Shortly before the trial she obtained appraisals of the two rings in her possession, and those appraisals show a value of $1,639 for one and $1,890 for the other. *See,* Exhibits CR-101 and CR-102.[17]

To begin with, the Court does not find Husband's testimony of an additional $50,000 in jewelry purchases during the course of the marriage to be credible.  In addition to general overall credibility issues previously noted there are two specific reasons for this conclusion.  First, Husband presented only his testimony on that point; he provided no documentary or photographic evidence or corroborative testimony of the existence of the purported additional items of jewelry.[18]  Second, Husband did not explain why, if he was careful enough to have obtained the four appraisals in 2007 he would not have also obtained appraisals for the other expensive items of jewelry he had

---

[17]

The Court is satisfied and finds that the ring appraised at $1,639 in Exhibit CR-101 is the same ring that was appraised at $5,500 in Exhibit 18, and that the ring appraised at $1,890 in Exhibit CR-102 is the same ring that was appraised at $6,500 in Exhibit 20.  The Court would note that the two appraisals obtained by Wife were for the "Dispense (scrap) Value" of the rings, while the corresponding appraisals from Husband are not so limited.  This may explain the disparity in the appraised values, but unfortunately there was no testimony provided to assist the Court in that regard.

[18]

Husband introduced two photographs, one from 1995 and the other from around 2011, showing Wife wearing items of jewelry, but all such items were among the 4 items which both Parties agreed were purchased, so they provide no evidence of any additional jewelry. See, Exhibits 22, 23.  The age of the photographs is also such that they have little or no probative value as to the current whereabouts of the missing necklace and pendant from the 4 acknowledged items of jewelry.

purportedly purchased. On the other hand, the Court finds Wife's testimony in this regard credible.

Thus for purposes of allocating marital property, the Court finds that it is dealing only with the four

items that were described at trial and which were the subject of appraisals, two of which Wife admits

having in her possession and two of which appear to be missing.

       Regardless of the number of items of jewelry and their respective values, there are

several possible scenarios to explain what happened to the missing items. One is that Wife did take

the items with her when she left, but is now attempting to deceive the Court by claiming she did not

do so. Having had the opportunity to observe the testimony and demeanor of Wife, the Court finds

this unlikely. Additionally, the Court would note that Wife's bankruptcy petition filed almost two

years ago lists the two rings among her assets. If she were deceiving the Court as to the necklace

and pendant one would wonder why not as to the rings as well. A second possibility is that

Husband knows where the missing items are or what happened to them but is attempting to deceive

the Court by claiming he does not have such knowledge. This too seems unlikely because if

Husband did have those items or did dispose of them somehow it would not seem to be in his

interest to raise them as an issue in this proceeding. A third possibility is that both Parties are being

truthful and that the items really are missing, perhaps because they were lost or stolen at some point

over the years but such loss or theft was never recognized, or perhaps because they remain

somewhere within the marital residence but have not been found by Husband.

       In the circumstances presented, the Court finds that the best way to address the

jewelry question is to allow Wife to retain the two rings as part of her in-kind personal property

allocation, while recognizing that if the other two missing items ever turn up, at the marital residence

or elsewhere, they will be treated as the property of Husband.  The Court notes that, although not determining a specific value as to these items, if the appraisals are to be believed, the value of the two rings is somewhere between $3,529 and $12,000, depending on which appraisals are accepted. Since Wife is only receiving minimal other personal property as a result of this allocation, it strikes the Court as fair and equitable to also allow her to retain the rings.

To sum up, the "universe" of marital property that is to be subject to allocation is $303,450 summarized as follows:

| | | |
|---|---|---|
| • | Wife's pension | $   84,238 (rounded) |
| • | Net proceeds of Farm sale | $ 155,330 (estimated) |
| • | Farm animals | $     7,500 |
| • | Farm equipment | $   24,700 |
| • | Rent and royalties | $   31,682 |
| • | Personal property (including jewelry) | To be allocated in-kind with no attempt at valuation |

### *(B)  Equitable Property Allocation*

With the property subject to allocation now defined, the Court can turn to the actual process of allocation.  As was discussed above, Pennsylvania law provides guidance in that regard and it provides a non-exclusive list of factors that the Court will consider. *See, 23 Pa.C.S.A. §3502(a)*.  The overall goal in this process is to "effectuate economic justice between parties." *Smith v. Smith*, 653 A.2d 1259, 1264 (Pa. Super. 1995).  Set forth below is a list of the statutory factors, followed by the Court's comments and findings as to each and how it applies under the facts of this case.

### (B)(1)  The length of the marriage (§3502(a)(1))

The Parties were married in 1994 and separated in 2016.  This length suggests that their financial lives had become substantially entwined.  This factor does not suggest an allocation favoring one Party or the other.

### (B)(2)  Any prior marriage of either party.  (§3502(a)(2))

The Husband was previously married for 28 years which resulted in three children. The record is not entirely clear whether that marriage ended in death or divorce, but either way it was so long ago as to be of little relevance here for purposes of the property allocation.  There was no evidence of any prior marriage of Wife.

### (B)(3)  The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties. (§3502(a)(3))

Husband is 75 years old and he reported no significant health issues.  Husband's primary source of income is approximately $1200 per month from Social Security.  Given his age, it is unlikely Husband will engage in any "outside" employment in the future.  He does receive additional income from "puppy sales," though the amount is unclear, and he should be able to continue this income stream because he will continue to reside at the marital residence even though the Farm was recently sold.  That is because Husband worked out an agreement with the buyer whereby he was able to remain in place following the closing by leasing a portion of the Farm from the buyer for a period of up to twenty years, with Husband also able to terminate that lease early at

any time upon 30 days written notice.  The portion subject to this lease includes the former marital home, a barn, and 2.5 acres of land.  The monthly rent will be $300 during the entire term of the lease.  Although no evidence as to the "value" of this lease was provided at trial (the lease had not yet been created), the Court concludes that it is a substantial benefit to Husband.  The Court takes judicial notice that the most recent mortgage/rent housing expense figure for Crawford County, Pa. as published by the U.S. Department of Justice for bankruptcy means test purposes is $660. Husband has thus secured his housing needs for the next twenty years for a figure less than half that amount, and is protected against any inflationary increases.[19]

Wife's age was not specifically provided at trial, but based on all the testimony clearly she is substantially younger than Husband.  Wife reported no significant health issues.  Her sole source of income is the salary from her teaching job, which is shown on her Schedules as being approximately $4,500 per month gross, with $3,200 take home after deductions.

### (B)(4)   The contribution by one party to the education, training or increased earning power of the other party. (§3502(a)(4))

There was some indication that Wife obtained a masters degree during the marriage that may have increased her earning power as a teacher, but there was no evidence as to whether or how Husband may have contributed in that regard so this factor does not apply.

---

[19]
The Court also takes judicial notice that the remaining life expectancy of a 75 year old male as of 2016 (the most recent figures available) was 11.18 years, so in all likelihood Husband has secured his housing needs for the remainder of his life on extremely favorable terms. *See*, Actuarial life table published by the U.S. Social Security Administration, accessed at https://www.ssa.gov/oact/STATS/table4c6.html.

### (B)(5)  *The opportunity of each party for future acquisitions*
### *of capital assets and income.  (§3502(a)(5))*

Both Parties are in similar circumstances in that they have steady  sources of income

that should  allow them to maintain a moderate standard of living.  There was no evidence presented

that would indicate any likelihood of significant future capital acquisitions or large increases in

income for either Party.

### (B)(6)  *The sources of income of both parties, including, but not limited to,*
### *medical, retirement, insurance or other benefits. (§3502(a)(6))*

The Parties' sources of income were discussed above.  Wife also testified that she

receives $600 per month in Social Security benefits for each of the two minor children of the

marriage who are in her custody.  There was no explanation as to why these payments are being

received, but the Court will presume that they are used for the benefit of the children and do not

effectively add to Wife's income.[20]  There was no indication that Husband is making any financial

contribution to the support of the children.

The Court also notes that Wife received an inheritance of property upon the death of

her grandmother several years prior to the separation, consisting of a parcel of land in the

Philippines with 3 small houses located on it.  This inheritance is not marital property, but Husband

argued that Wife would be able to receive an income for rental of the property.  Wife countered by

testifying that family members were residing in the houses, were not paying any rent, and that she

---

[20]
In his "Findings of Fact" Judge White noted that one of the children has turned 18, so it is
possible Social Security benefits for that child have terminated.

30

had no intention of charging any rent.  Based on some photographs that were admitted into evidence,

the Court concludes that the houses are in very poor condition and likely of small value, if any.  It

therefore finds that any prospective income that Wife might derive from the houses is negligible.

Medical insurance was not raised at trial, but the Court presumes that Husband is

covered by Medicare given his age, and that Wife has coverage through her employment.


*(B)(7)   The contribution or dissipation of each party in the acquisition,
preservation, depreciation or appreciation of the marital property,
including the contribution of a party as homemaker. ((§3502(a)(7))*

There was no indication in the evidence presented that either Party "contributed" or

"dissipated" with respect to the marital property to such a degree out of the ordinary that it should

be recognized in an allocation of the property.


*(B)(8)   The value of the property set apart to each party. ((§3502(a)(8))*

The Court finds that it makes sense to allocate the entirety of Wife's pension to Wife,

and to account for that by adjusting the relative allocation of the remaining marital property.  There

are a couple of reasons for this approach.  Most importantly, given the disparity in ages between the

Parties, it is questionable how much value Husband would actually obtain by being assigned a

portion of the pension, which will likely not begin making any payout for a number of years into the

future.  Secondarily, the Court also believes it will be easier to leave the pension "as is" rather than

add the additional complication (including cost) of dividing a portion of it.  The value of the pension

as of the date of separation is exactly known, so setting it aside for Wife presents no difficult

problem and fairly allocating Husband's share from other liquid assets is more practical without negatively impacting Husband.

The other marital property to be set apart for each party is the marital personal property. The Court is unable to place a value on it due to the lack of evidence, and in fact has no firm grasp on the overall scope of such personal property. In these circumstances it seems equitable to the Court to allocate to Wife the two rings and the few other items (appliances and family heirlooms) that she specifically requested, while allocating everything else to Husband, regardless of value.[21]

### (B)(9) The standard of living of the parties established during the marriage. (§3502(a)(9))

There was little, if any, direct evidence as to standard of living presented at trial. From what the Court was able to glean, the Parties do not appear to have lived an extravagant lifestyle above their means, notwithstanding that both are currently in bankruptcy. Husband will be able to continue residing in the same location on very favorable terms. The circumstances as to Wife's current residence is unknown other than that she reports a monthly rental or homeowner expense of $700 on her Schedules.

---

[21] Wife expressed a preference, without objection by Husband, for such allocation of personal property, and it seems eminently reasonable to the Court. *See*, Wife's Post-Trial Memorandum, Doc. No. 206. *See also* n. 15, supra.

***(B)(10)   The economic circumstances of each party at the time
the division of property is to become effective. (§3502(a)(10))***

This has already been discussed in connection with some of the other factors noted
above.

***(B)(11)   The Federal, State and local tax ramifications associated
with each asset to be divided, distributed or assigned,
which ramifications need not be immediate and certain.
(§3502(a)(10.1))***

The Chapter 12 Trustee reports that there will be significant tax liability associated
with the recent sale of the Farm.  She was provided with an estimate of $60,000 for such taxes, and
that has already been factored into the anticipated net amount of $155,330 that will be available to
the Parties from the sale proceeds.  Once the Parties separated and began the divorce process, it was
almost inevitable that the Farm would need to be sold because neither party, individually,  appears
to have the wherewithal to retain it.  It is unfortunate that this large tax liability had to be incurred,
but the Court does not find that this factor tips the equities of an allocation in either direction.[22]

---

[22]

In some post-trial filings Wife seems to be arguing that Husband should bear the burden of
the capital gains tax liability incurred as a result of the sale of the Farm.  For instance, in the
*Plaintiff's Second Supplemental Post-Trial Memorandum in response to the Closing of the Marital
Real Estate on November 1, 2019*, Doc. No. 269, Wife notes the large capital gains tax that is due
and says that she has no tax background, no knowledge of how the business entities were set up for
tax purposes, and does not know if the way the business and real estate was set up for tax purposes
was in her best interest.  This document was stricken as unauthorized, and Wife has abandoned a
subsequent effort to have it allowed, but regardless the Court addresses the point raised therein as
a matter of equitable consideration. In that same document Wife also argues that Husband should
be solely responsible for the real estate taxes that have accrued on it since the date of separation.
*See* n. 14, *supra*.

**(B)(12)   The expense of sale, transfer or liquidation associated with
a particular asset, which expense need not be immediate
and certain. (§3502(a)(10.2))**

The only expense of this nature was with respect to the Farm that was recently sold.

That expense has already been incurred, shared equally and is factored into the net value of the sale

proceeds.

**(B)(13)   Whether the party will be serving as the custodian
of any dependent minor children. (§3502(a)(11))**

This factor tilts in favor of Wife in that she is the custodian of two minor children

born of the marriage.  The two children, both sons, were shown as being 12 and 16 years old when

---

If the Court were to adopt these positions,  however, it would be contrary to the finding that the Farm is purely marital property and should be treated as such despite the alleged partnership agreement favoring Husband on a 90-10 basis.  The Court would thus be obligated to revisit that ruling, which could negatively impact Wife in various ways.  For instance, as to the real estate tax issue, if the Court were to hold Husband solely responsible for post-separation amounts of those taxes it would also have to reconsider its rejection of Husband's argument that he should be entitled to sole  credit for expenses incurred for the maintenance of the Farm since the separation.  It is also questionable whether the evidentiary record establishes a "pre" versus "post" separation allocation with sufficient precision to even allow such an approach.

As to the capital gains tax issue, Wife was certainly aware at the time of trial that the Farm was being held in a partnership form, that it was going to be sold as part of the bankruptcy process, and that there would be some tax consequence as the result of such sale.  She did not provide any evidence at trial to show that such tax consequence would be worse for her than if the Farm were being  held in a tenancy by the entireties, nor has she cited any legal authority to that effect in any of her post-trial filings.  All she has offered in that regard is speculation and concern that she might be negatively impacted because Husband chose to hold the Farm as a partnership.  Such unsupported speculation is not a sufficient basis for this Court to consider capital gains tax implications as a factor in the property allocation.  Unfortunately, as has been noted elsewhere in this Opinion, this is not an isolated instance within the case. The Court is disappointed in both sides for failing to provide a more thorough record either through stipulation or actual evidence via testimony or otherwise at the trial.

34

Wife's bankruptcy was filed, which means they are now 14 and 18. It will thus be at least several more years before both are likely gone and on their own.

Having reviewed and considered the statutory factors, the Court must now decide on an equitable allocation of the marital property. There are no "bright line" rules to direct the Court in this determination. Instead, as one court recently explained:

> A trial court has broad discretion when fashioning an award of equitable distribution" . . . "In making its decision regarding equitable distribution, the trial court must consider at least the 11 factors enumerated in 23 PA.C.S.A. §3502(c)." . . . However, there is no standard formula guiding the division of marital property and the 'method of distribution derives from the facts of the individual case' . . . while the list of factors in Section 3502 serves as a guideline for consideration, the list is "neither exhaustive nor specific as to the weight to be given the various factors." . . . Accordingly, "the court has flexibility of method and concomitantly assumes responsibility in rendering its decisions." . . .

*Hess v. Hess*, 212 S.2d 520, 523-24 (Pa. Super 2019) (citations omitted).

After summing all of the relevant factors up, the Court concludes that, while there is a fairly close balance, there should be a slight advantage given to Wife in the allocation of the marital property. There are three principal reasons for this conclusion.

First, no evidence was presented as to custody being an issue. Furthermore, the fact that Wife has custody of the two children imposes an extra burden on her. In the recent state court divorce proceedings as reflected in the *Status Report* referenced on p. 5 *supra*, Judge White refers to a custody issue but says he does not address it. Second, while little if any direct evidence was placed on the record by either party as to this consideration, the future financial picture for each of the Parties is fairly secure, Husband's is more so.

Husband's Social Security income is assured, and the 20-year lease on the former marital residence has virtually guaranteed his future housing needs. While Wife currently has a teaching job, that job is not assured and if she were to lose the job it is unclear what prospects she would have to secure another teaching position within a reasonable distance. Third, the disparity in age between the Parties is such that Wife can reasonably be expected to live longer than Husband. The Court therefore finds that the marital property (aside from personal property) will be allocated 55% to Wife and 45% to Husband.

As previously determined, the total value of the marital property to be thus allocated is $303,450, which means Wife is to receive $166,898 and Husband to receive $136,552. Wife will fully retain her pension. When that value ($84,238) is deducted, it reduces Wife's share of the remaining liquid assets to $82,660.

That is not the end of the matter, however, since several more adjustments need to be made to the final distribution of liquid assets. The value of the farm animals ($7,500) must come off Husband's share since he sold them and retained the proceeds. Similarly, the $4,700 in sale proceeds for the farm equipment that Husband received must be credited against his share of the liquid assets. Husband will retain the Mahindra tractor, so the value of that item ($20,000) will also come off his share. When those adjustments are made, it means Husband is to receive $110,584 of the remaining assets. The rent and royalty income from the real property since the date of separation must also be accounted for. Husband has already received the 2017 rent ($8,250), the 2018 rent ($9,075), and the net gas royalties ($4,375), so the total of those ($21,700) must also be credited against his share of the remaining liquid assets, reducing it to $82,652.

Finally, the 2019 rent of $9,982 was paid to Attorney Gary Skiba, former attorney of Husband. Of that amount, the Court previously directed the release of $1,200 to be paid to the mediator on behalf of Wife with respect to the failed mediation. The remaining $8,782 in 2019 rent is still being held by Attorney Skiba. The $1,200 amount must be credited against Wife's share, reducing it to $81,460.[23]

As identified previously, the only liquid assets to be distributed are the approximately $155,330 in Farm sale proceeds being held by the Chapter 12 Trustee and the remaining $8,782 in 2019 rent proceeds being held by Attorney Skiba. The Court will direct Attorney Skiba to pay the remaining rent proceeds he holds in escrow in that amount to the Chapter 12 Trustee for ultimate distribution. That means of the $164,112 to ultimately be held by the Trustee, Wife is entitled to a payment of $81,460 and Husband to a payment of $82,652.[24] However, attorney fees have also

---

[23]

Husband also testified at trial about payment for the funeral of Wife's grandmother, who died on February 13, 2013. *See*, Exhibit 16. The testimony was confusing, with Husband at one point seeming to indicate that he, or "the Farm," had paid for the entire funeral in the amount of approximately $13,000, then subsequently seeming to say that insurance and public assistance had paid for some unspecified portion while the Farm paid the balance. Husband took the position that such payment should be reimbursed by reducing Wife's share of the marital property. The Court rejects such argument. Not only was there insufficient proof of any such payment presented, any such payment would have been made more than 3 ½ years prior to the date of the Parties' separation. In the absence of any evidence otherwise, or the proof of a specific agreement for repayment, the Court views any such payment that may have been made as being done out of familial love and affection existing at the time of the payment, and not with an expectation of repayment.

[24]

The $164,112 figure is only a "best estimate" at the moment since as of this writing the Court's knowledge of the extent of the applicable capital gains tax has not yet actually been finally calculated and paid. Accordingly the Order accompanying this Opinion will direct that the remaining Farm sale proceeds held by the Trustee, be paid over *pro rata* with 49.6% to Wife and 50.4% to Husband in case the $164,112 figure proves to be inexact. By way of further explanation, the figures listed in this Opinion for the payout from the Trustee to the Parties are based on the assumption that the Trustee will end up holding $164,112 once all other distributions, including

been directed to be paid out of the funds being held by the Trustee, so the payment otherwise due

each of the Parties shall be reduced to reflect the amount of attorney fees paid out of the fund to their

respective attorneys.[25]

---

payment of capital gains tax have been made. Assuming those figures remain firm, 49.6% of the
funds would then be paid to Wife (i.e., $81,400) and 50.4% of the funds paid to Husband (i.e.,
$82,652) so as to arrive at the 55/45 overall marital property allocation that the Court has decided
should be applied. Rather than delay matters further by waiting to see what the actual amount is that
the Trustee will be holding and then order the exact amount to be paid to each side, the Court has
opted to expedite matters by providing as a contingency in advance that if the $164,112 figure
proves to be incorrect the Trustee should split whatever amounts she ends up holding in the same
49.6% to 50.4% ratio. The Court is confident that any deviation from the $164,112 is likely to be
small, so maintaining this "split ratio" should cause, if at all, no more than a *de minimus* deviation
from the overall 55% to 45% split. If there turns out to be a larger than anticipated change in the
distributive amount the Trustee is holding, such that applying the 49.6% to 50.4% split would be
more than *de minimus*, the Trustee or the Parties are free to move for appropriate relief. As
previously noted, attached at Appendix "A" is a chart further identifying the Court's computation
for purposes of its allocation of marital property. The within Opinion reflects the Court's attempt
to set forth specific payments to be made to the Parties from the funds being held by the Trustee
based on the best information available to it. The Court realizes the possibility of an error in the
figures used due to possible transfers and payments made since filing of the Trustee's *Report of Sale,*
Doc. No. 266. In it's accompanying Judgment Order, the Court will welcome the filing of an
appropriate reconsideration motion alerting the Court in such event.

[25]     Both Parties proposed that each side be responsible for their own attorney fees and costs, and
the Court will accept that approach, at least for the time being (see discussion *infra*). Fee awards
to the Parties' attorneys have been made or are pending as follows: Kenneth M. Steinberg in the
amount of $44,700 (9/28/19) and Michael Antkowiak in the amount of $40,813 (12/12/19; 1/8/20)
and Gary Skiba in the amount of $23,482.78 (7/23/19). It is unclear to the Court whether any of
these fees have previously been paid. The Order accompanying this Opinion will require an
accounting to show distribution of the marital property, including any payment of attorney fees.
This may also be a good place to note that, given its findings set forth herein with respect to the
disruptive party conduct that occurred throughout this case, the Court considered the possibility of
adding that as a factor for consideration when making the equitable allocation decision. However,
some research disclosed no cases where litigation misconduct was ever applied as a factor in such
allocation. At the same time, however, there is authority applying Pennsylvania law for the
proposition that litigation misconduct can serve as a ground for awarding counsel fees in an
equitable allocation proceeding to a party that has been harmed by the misconduct. *See, e.g., Marra
v. Marra*, 831 A.2d 1183, 1188 (Pa. Super. 2013) (not error for court to award attorney fees to wife
who was "thwarted by husband at nearly every turn" in effort to make equitable distribution
recovery). In light of the Court's findings as to litigation misconduct it may not be equitable to hold
the Parties to their prior positions regarding attorney fees. Accordingly, this Opinion will be without

An appropriate Order follows.

Dated: January 16, 2020

Thomas P. Agresti, Judge
United States Bankruptcy Court

Case Administrator to serve:
      Kenneth Steinberg, Esq.
      John Nagurney, Esq.
      Debtors
      Gary Skiba, Esq

      Michael Antkowiak, Esq.
      1149 Liberty Street, Suite 3
      Franklin, PA  16323

      Senior Judge H. William White
      Court of Common Pleas
      Crawford County Judicial Center
      359 E. Center Street
      Meadville, PA 16335

---

prejudice to either side filing a petition for award of attorney fees within 14 days.  Any such petition should be very specific as to how the alleged litigation misconduct of the opposing party caused an increase in attorney fees beyond what otherwise would have been required, or any other harm.

| Preliminary Distribution of Farm Sale Proceeds | | |
|---|---|---|
| **Gross Proceeds** | $332,664.76 | |
| **LESS:**  Closing Costs | $24,757.21 | |
| PNC Lien | $31,208.44 | |
| Trustee Fees (5% of $276,700) | $13,835 | (est.) |
| Capital Gains Tax | $60,000 | (est.) |
| Galaxy FCU Lien | $47,533.58 | |
| **Net Proceeds to Debtors** | $155,330[1] | (est.) |

| Marital Property Summary (other than in-kind personal property) | | |
|---|---|---|
| **Farm Sale** | $155,330 | (est.) |
| **Wife's Pension** | $84,238 | |
| **Farm Animals** | $7,500 | |
| **Farm Equipment** | $24,700 | |
| **Rent & Royalties from Farm** | $22,900 | |
| **Remaining Rent to be Applied** | $8,782 | |
| **Total Monies for Distribution** | $303,450 | (est.) |

| Marital Property Distribution other than in-kind Personal Property (before atty. fee deductions) | | | |
|---|---|---|---|
| **Wife** | | **Husband** | |
| **Source** | **Amount** | **Source** | **Amount** |
| Farm Sale | $81,460 | Farm Sale | $73,870 |
| Pension | $84,238[2] | Rent | $8,782 |
| Mediation fee advance from Rental Proceeds | $1,200[2] | Prior sale of farm equipment plus tractor | $24,700[2] |
| | | Previously Rec'd Rent and Royalties | $21,700[2] |
| | | Farm Animals | $7,500[2] |
| Total (55%) | $166,898 | Total (45%) | $136,552 |

---

[1] For purposes of calculating the net proceeds from the farm sale, the Court used the estimated figure of $155,330 since the exact value of the capital gains tax and trustee fees are yet to be determined.

[2] Credited toward distributive share.

# APPENDIX "A"